calling the first appeal for oral argument. And that is Joseph Wallace versus Superintendent of Mahanoy SCI. Attorney General Mr Sailor. You want to go forward for the petitioner, please? Thank you, Your Honor. Good morning, Your Honors. My name is Sam Sailor. Um, and may it please the court. I would ask for three minutes in rebuttal. Go ahead. Thank you. Um, no judge has ever reviewed Joe Wallace's post conviction claim. He's never had a hearing. He's never had an opportunity to present the merits of these claims. At each stage of this case, Mr Wallace's mental illness has stood in the way and it has rendered him unable to file for over a decade. And it is also deeply related as to why his conviction is unconstitutional. Let's just see what we can agree upon, please, for purposes of setting the time frame or at least one of them here. Are we agreed that Mr Wallace did not file his habeas corpus petition within the one year period under a D. P. A. And that was due on January 7 of 2000 and two. That's correct. And right. And do we agree that he asks for equitable tolling of a 13 years and nine month period? Uh, that would be until he actually filed on September 29 of 2015. That's correct. So with respect to the equitable tolling request, I'm I'm curious as to what it is you contend for purposes of tolling. Is it that during that 13 years and nine month period, my previous question referred to, he had no period or periods of lucidity such that he could have filed for habeas. That's exactly what we're contending, Your Honor. But he did during that period of time filed a P. C. R. A. He did with the substantial assistance with other inmates. So he did with he would have had even more substantial assistance if it had been filed by counsel. But how is that? How is that a point of any importance here? Well, Your Honor, I think we have to look at exactly what Mr Wallace was experiencing at the time. It just emerged from, uh, a padded cell in S. C. I. Um, at which time again, we're talking about a 13 year and nine month period of time here. So during which you contend and responded affirmatively to my question, he was unable, uh, that it was impossible for him. That's the word you used to have filed for habeas relief at any point in time. So what point on the, uh, on on this particular time frame are you referring to? And you just emerged from a padded cell? Well, uh, in 2013, in which he filed his state P. C. R. A. Uh, he had just emerged from psychiatric observation. So I'm actually a few different psychiatric observations. Um, the medical records reflect that he had sending it to, uh, paranoia and delusions. Thank you. Don't the records also show that during this lengthy period of time, he had a prison job of some kind. 2000 and nine. Uh, he he had some responsibilities in prison, although those were quickly taken away from him. And I think that that we can after David that he submitted both himself as well as the medical records show that he was back in 2012. The D. O. C. Medical records say that his increasing delusions and paranoia were maybe as a result of being over medicated and having his medications changed around. Mr. Mr. Mr. Submitted Mr. Sailor. I don't want to monopolize here, and I want to turn this over quickly to to my colleagues, Judge McKee and Judge Ambrose. But I've I've reviewed the medical records, and I is by that. I mean the acronym G. A. F. The global assessment of functioning. Yes. Would you agree that there was considerable variance in Mr. Wallace's reported G. A. F. During his period of incarceration and that, in fact, there were periods that he was said to be doing pretty well that he was in partial remission, at least the references to remission. Your honor, from what I can tell from the medical records happens three times. There is this good purpose of in his functioning within U. S. C. Custody. He's not. He's not at that point violent or a threat to himself or other quickly descends into that kind of state very soon after that. So while he may have been controlled, I have the symptoms controlled. He was essentially so over medicated to be functionally. Is that what the record? Is that what the record shows throughout that he was? He was over medicated and functionally useless. I hope it's or for rather to treat symptoms and that, in fact, they were treated in such a way that on numerous occasions he was observed by professionals to be in remission to to be looking stable to be okay with my meds, he said. He also reported having a blunt affect a flat affect. There's an affidavit that's producing the objections from a friend. Annette Connor. Mr. Wallace was extremely slow. There's an affidavit for his sister, Christy Primus, who in 2013 when communicating comprehensible flow and that he appeared to be still in the throes of mental illness. The fact that she disregarded any of the mailings that she gave to him. So I think there's 2007 and 2009. Lucid. That seemed to me to be the crucial period that may have a problem. There is there are three references to him being in remission, Your Honor, and those are against three references for purposes in D. U. C. Custody and they're not for evaluating whether he can file a federal habeas petition. I think I think the clearest evidence that he's not lucid is that he doesn't file anything during that time. What was that? That was the evidence that you can't say that pretty circular. Yeah, really is because then everything would be a couple of tolling. There's no following. Therefore, he must not have been lucid that that may be the weakest argument that we'll hear today that can't be true. Well, I would say that in that time period, his medication had been increased over a number of years in 2001. For instance, when he first entered into D. O. C. Custody, he was experiencing according to the D. O. C. Medical professionals, a student dementia and looking over medicated. And from that point, his medication is only increased 75% increase of respirator, which is a very powerful psychotropic medication. These medications can dull your effect and I've been in 2007. I thought they started. They've got the medications, right? They reduce the medication to have a more verbal and inner active effect and that lasted, I guess, until 2009. Then there was some problems in 2009 became heavily medicated again. Is that incorrect? If well, from Mr. Wallace's affidavit, again, we're talking about records in which there's maybe a page or two total of reporting from that time period. Mr. Wallace's affidavit says that he was essentially too slow and too over medicated to comprehend his any sort of post-conviction remedies at that time. There's a visitor, you know, that I referenced earlier, Annette Connor, who visited him in 2009. That says how slow and inarticulate a common friend who was on a lot of drugs. So actually my understanding is that the medication had risen into that 2009 period and then began to lead him off of that. And then at that point he began to descend again into more of a throw. Your position sounds like if he's not on medication, he's in bad shape. He's not fully capable, not fully competent. And if he is on medication, he's dulled and he's not fully competent. That's pretty much of a catch-22, at least for purposes of trying to analyze a request of this kind for equitable tolling. I think your Honor can appreciate that mental illness is never a linear, never a straightforward analysis by a doctor. I think they were just trying to get it right. And I think they had over medicated him at that point. They over medicated him. Can I jump in here to, I like to work backwards. Let's assume for the moment that he was completely incompetent until March 2013. Supposedly after March of 2013, he was doing a lot better. In fact, within a few months later, he filed a PICRA petition. And you've dealt with it very briefly, including in a footnote on page, looks like page six or so, that you're arguing for equitable tolling. But let's assume that equitable tolling begins, he becomes mentally competent in March of 2013. Therefore, he needs to file something by March of 2014 in terms of federal habeas. However, what he files in the interim is a clearly out of time PICRA petition with the help of a person in prison. That is denied for being out of time on July 29th of 2015. And a few months later, he filed for federal habeas. But the federal habeas is now two years, two and a half years. After March of 2013. To get equitable tolling, you need two things. You need diligence. Let's assume that he was diligent during that time period. But if the extraordinary circumstances, the mental incompetence ceases in March of 2013, how do you put that prong after March of 2014? Well, your honor, setting aside the diligence, which I think Mr. Williams has diligence. My question is, how do you go extraordinary circumstances after March of 2013? Yes, your honor. So I think there is numerous on the record indications that he was still experiencing extraordinary circumstances by way of mental illness. No, but what he did was on the advice is they filed a PICRA petition. Does the PICRA petition, which was clearly out of time. Does that retoll the time period for filing a habeas? At this point, at this point? No, and that's the state of the law is that it does not toll because the state courts also found it out of time. So then so then what happens is you have to file either a habeas go straight to a habeas or file a protective habeas as a placeholder. And neither one of those occurred within the one year period after March of 2013. That's correct. He was relying on inmates heavily on other inmates to advise him and to essentially file these things for him. The evidence shows that Mr. Davis, if he was if he was capable of reaching out to a fellow inmate, if he was capable of holding a job for a period of time, if he was as the records demonstrate from time to time in partial remission doing pretty well at one point, there was a suggestion in the record. This is December 18 of 07 in full remission. Why couldn't he have somehow attempted to reach out to counsel since you are continually arguing that his use of a fellow inmates expertise, so to speak, was inadequate? Well, he was not represented by counsel in 2007 to 2009. He was represented by I didn't say I didn't say he I didn't say he was. My question is, he could reach out and have sought counsel, right? Don't you think he was competent to do that? Absolutely not. Your Honor, I let let let let me focus on a broader question here, if I may, and that is what is it that you're seeking? My understanding is that the appeal here is really the refusal of the district court to grant an evidentiary hearing and provide funds for the selection or for seeking an expert. Is that right? Yes, that's correct. Your Honor. All right. So what is it that you would do and what did you tell the district court you would do if you were granted that relief? If we were granted in terms of the equitable tolling, if your honors are have some doubts, which it sounds like you may about the record as it is, we would ask for an evidentiary hearing. Actually, I speaking only for myself. I have very little doubt about what the records show and they show it at various points in time. So what is it that retrospectively you would attempt to have some third party who did not have contact with Mr. Wallace at that point in time contribute to the question of reopening the record and reopening for what? Well, when Mr. Wallace presented this information to the district court, one of the best ways at that point was to resolve it was to hold a hearing and that wasn't done. And that left the magistrate judge having to essentially gap fill and interpret some of these. That was not the question. That was not what? Yeah, my question was what if you had been granted that hearing, what would you have done? What would you have shown or what would you have asked to show? What I would have asked to put on expert testimony to tell to educate a court about Mr. Wallace's bipolar one disorder in which he's experiencing bouts of paranoia and delusions. And he had that back when he had that back at the time contemporaneous with the killing here, right? And I'm sorry to repeat your question. Did he not have that condition? Was he not suffering from those very conditions back at the time of the killing of his wife? Yes, he was. And in both doctors, both doctors cook and said off have opined that his condition would not have met the McDotton test. Don't they say that in their respective reports? Yes, they do. So the attorney here he had as defense counsel and the homicide prosecution one apparently prevailed in having the Commonwealth take the death penalty off the table or maybe the Commonwealth decided that on its own and was successful in negotiating a plea down from murder one to murder three. This was an experienced defense counsel, wasn't it? 27 years and and the person in the office. Who handled all or most of the mental health cases. Isn't that what the record shows? That's correct. You're right. The Commonwealth took off the death penalty before any sort of negotiation began. I think the crux of the the entire I think it's just the actual innocence argument. And I the fact that Council never investigated this link between Ritalin the stimulant induced psychosis, which when contextualized with other evidence that Council could have produced and had in his possession including mental records to the 1980s. I'm struggling. I'm struggling as I have been in my since my first contact with this case is with the Ritalin issue and putting aside the doubts that I concede I have as to whether this was newly discovered evidence because I remember just anecdotally from my real own reading back in the 90s about news that Ritalin could have an adverse effect on children with an existing medical condition or psychiatric condition. But again, putting that aside, what difference does the Ritalin make here? It's merely a causative agent and if it acts on Mr. Wallace the way you're suggesting that it might have the manifestations were still the same you'd still end up with the same expert report. Would you not be the same expert opinion? That is that he was severely mentally ill that he was psychotic that he was bipolar. How does that change anything? In 2013, Dr. Cook who was one of the evaluating doctors in 2000s in order to pass through the actual innocence gateway a petitioner might show new reliable evidence that is more likely than not that no reasonable juror would have convicted him in light of focus on the new the context newly discovered there is it's not what is new mean is it newly discovered or under Reeves if it's known by constant the time not presented is that sufficient to come within the gateway? Well, I believe under Reeves the evidence was known at the time, but it was just not investigated by Council and so that related to Council's effectiveness. That's why I wanted to know. That would be the same case that I newly discovered. Okay. Is newly discovered Council never investigated this link, even though he had in his possession documents that showed that Mr. Wallace's psychosis was likely triggered by stimulant use in the 1980s. You also had your argument is I think that he should at least have a hearing to determine whether or not given the record that's there now there was ineffective assistance of Council in terms of not presenting evidence the court which would have taken malice off the table because for m1 and m3 out of the death penalty, but was it murder three? You still need the element of malice. You're arguing. I think that was evidence that should have been presented that would have negated the element of malice. Therefore, you get under the sub case. That's I think what you're trying to tell us my argument regarding malice is that he is that it was not a knowing plea for two different experts to say that he acted without malice and Mr. Wallace was never a prize of this fact. I think you may have just taken a strike on a softball, you know, I understand what you're saying. But but as you can pick up in the questions, it's not helping us a great deal. If we focus in an actual innocence as opposed to the equitable tolling which these from my perspective, it's harder argument if you could show that there was evidence that wasn't introduced that would have taken malice off the table out of the equation, even though I went from m1 down to m3 will really should be looking at maybe a manslaughter or maybe something else in make the McNaughton test then evaporates doesn't because we're not talking about innocent because he was legally competent under the McNaughton test and correct me if I'm wrong, but I thought your argument was something besides McNaughton. Am I wrong about that? My argument is that experts never had in their possession the fact that he was taking Ritalin that according to his psychologist nearly days before that he was experiencing. But it was escalating that dr. Bebo and just the day before he killed his wife said to reevaluate his medications. That's what his experts don't know. So, so isn't it? So doesn't that position necessarily require that somehow taking Ritalin would exacerbate a pre-existing psychosis in a manner somehow different and separate from an existing psychosis worsening because of some other cause again. I don't understand how the causative agent has any impact here. If the observations of the psychiatrist are based on as they were here and always are medical records that existed what the patient told the physician and the other information that is available to the physician about the patient. What what changes just because he took Ritalin and and and what what did you offer to the district court in that regard to persuade the district court that you want to be able to pursue such an issue that I admittedly don't understand. Well, Mr. Wallace and his prostate petition raised the issue of actual innocence and his objections also raised it as well. I was not counseled below. The issue was never briefed and it was never argued at all. So we would argue at the very least we'd be entitled to an evidentiary hearing on that on that issue regarding the Ritalin though. I think it's important that the honors understand that if all experts in the case were not aware of the Ritalin then that could have made a difference to the jurors. And that's the point of interaction. We actually get through the gateway there. Whether to a reasonable juror. Okay, so how I mean, how is that counsel's responsibility here? We have three psychiatrists actually two psychiatrists and one psychologist who examine Wallace fairly close to the event and we all know what the opinions are. We also know that our jurisprudence is fairly deferential is deferential. I should say to strategic decisions made by counsel. Now there was a strategic decision here to suggest Mr. Wallace that he plead to murder three rather than go to trial where he would have had exposure to murder one. Why is that ineffectiveness on the part of counsel? Since he made the suggestion he did. In fact, the record is clear that at one point he was considering going to trial and then that changed isn't the responsibility the responsibility of the docs here to thoroughly examine and inquire into medication. If if the medication has any relevancy at all to the manifestations of that apparently led to the homicide. Well counsel counsel's failure to investigate any sort of link between the prescriptions can be strategic under Wiggins under Strickland. If there's no investigation at all, the fact that he pled him down to a lesser degree doesn't launder the lack of investigation a complete defense in the case. So so counsel should have sua sponte raised some psychopharmacological issue here that was not presented to him by the three psychiatric professionals who were consulted and rendered opinions. Is that what you're saying? He should have recognized that based on what he had in his possession, including stimulant induced psychosis from the from the 1980s as well as comments in just the days before. What would be the relevance of that? Let's say you're right that he should have recognized that. What do you then do with that evidence? Once you have it? How would that make sense to the doctor? It's still counsel's job. I would I would still contend. It's still aware of it. Yes, it's absolutely counsel's job to rise of that information. I don't think counsel can be presumed to be action strategically if they aren't giving the full briefing full information to their own experts. Why were Dr. Cook and Dr. Sadoff retained? Why were they asked to render an opinion? From the records, you know, I I don't know. I I believe I mean, I I guess I don't understand your question. Sadoff, I've said that before me many, many times. He's the government psychiatric expert. I'm assuming that and I'm not adjusting this to my colleague, but but to you, Mr. Sheriff, correct me if I'm wrong. I'm assuming he was brought in to establish mental competency. That's right. And actually both of them said that he was barely competent and then and then Mr. Wallace's competency was never checked. But but competent to do what? Let's focus in on that. Competent to do what? Actually engage in formal trial proceedings or or plea proceedings. Okay, that go to whether or not does that examination that was done at the time or did any examination inquire into whether or not he was mentally capable of having malice at the time? He killed his wife looking at all the statements, but I don't know how you get malice just from my position malice out of the statements other than the very fact of killing itself, which is not what the law of Pennsylvania recognizes as malice. Well, I understand your honor. That's correct. Yes, the two defense experts said that he did not act with malice. And that both of them rendered that opinion to trial counsel. And then the information that I have is that then how was counsel ineffective? If counsel has that information. Walk me through that. Then what does that do to you? What does that get you? What do you do with that? Well, for one, it's so I think it's two different problems. One is that it's a failure to present these malice opinions to Mr. Wallace to make a decision as to whether he wants to plead or not to a crime that was element includes malice. And it's also in making sure that the experts again, I think this has to go back to the responsibility of trial counsel. And our fault of the trial counsel is to make sure that his experts are fully briefed and fully updated on all of Mr. Wallace's medications and also what the for instance, the correct standard of malice is and and then to inform Mr. Wallace of what these experts say and here there was a real disconnect to their serious disconnect that resulted in a plea while on its face was certainly to a lesser degree, but it was for the max penalty for third degree. So he received no real benefits to this other than taking the first degree off the table. That's a big benefit. That's a huge benefit. Absolutely. But if Mr. Wallace's decision, it's hopefully Mr. Wallace's decision that he was not given this decision in this context. He was coming. It's Thank you. He was never re-evaluated and only 20 days after his plea in DOC custody, the DOC doctor said that he was experiencing pseudo-dementia looking over medicated and had an axis 5 diagnosis of 40, which is extremely low functioning. Just you know, that axis 5 diagnosis. Totally, it never rises above 50. And while the axis 5 is not used in DSM 5, it was certainly used at that point as an indication of how low Mr. Wallace's function was despite the fact that he may have been the symptoms may have been in remission during 2007-2009. Let me let me just this will be my last inquiry and before my colleagues ask whatever questions they wish to ask further review, but doctors Cook and Sadov were not prosecution witnesses. Were they? They were not retained by the prosecution. No, by the defense. Yes, they were defense witnesses and did either or both of them indicate that what they were saying about malice was malice in the legal sense or malice in a more generic sense. I think the contentions in the Commonwealth was that they were using any correct definition for malice. I would say that their opinions their respected professionals and that they could have testified to this just lack of malice to enduring. Well, what the Commonwealth did know though and what Defense Council would have known and going about negotiations here is that the Commonwealth did have an expert witness. Dr. Michaels, right? Yes, that's correct. And and Dr. Michaels did opine that Mr. Wallace my opinion that Mr. Wallace knew that the stabbing and other injuries that he had inflicted on his wife were wrong and would cause her death. It is my understanding that malice is defined as and then he so he ultimately writes it is my opinion that Mr. Wallace's killing of his wife was done with malice now at trial that could have been used to support a first-degree murder conviction. Could it not? Yes, sir. So Council had that in negotiating a plea here to murder three because the Commonwealth the prosecution had an opinion in its pocket that could be presented for the purpose of showing malice whether what the other docs were talking about was legal malice and malice in a more generic sense. It's still not a knowing plea at that point. Why isn't it? I'm sorry. I didn't know you're stating a conclusion that it wasn't knowing. I'm asking why given what the change was just then with the Chief. You know, Mr. Wallace was never told about his other malice opinions or that either lack of malice opinions before pleading guilty. You know, that's that's that's one of the major constitutional problems with this conviction is that it's ultimately his decision and while there may have been some negotiation as a result of the conflicting malice opinions. Also a jury can hear what each doctor says and I think obviously obviously and if the jury had chosen to believe dr. Michaels, then your client could have been convicted of murder one which in this case would have required life imprisonment. Yes, that's correct. Judge judge McKee judge Ambrose, please. I know I've been asking a lot of questions. I'll wait till rebuttal. I have one question to follow up with rebuttal. All right. Thank you. Mr. Saylor. We will have you back on rebuttal. Mr. Cassandra. I'm a Billy's the court Nicholas Cassandra chief deputy district attorney of Chester County. I want to start by responding to something judge Smith's just said with the conflicting expert opinions on malice. It's in the record that the suppression hearing that the prosecutor stated to judge McElroy that she intended to file a motion to exclude defense testimony on certain issues. The actual motions not in the record, but she said but that was based on the malice that the two experts of the defense were not using the legal definition of malice and they should be precluded from then expressing those opinions because it wasn't based on Pennsylvania law. I want to get to the the this issue of the drugs. Dr. Sadoff list all these drugs that the defendant says. Dr. Michaels was aware of them because he cites them also and says he read Dr. Sadoff's report. Council. Mr. Brunson this case actually wrote to dr. Cook to investigate this based on what their doctor cook had said in another letter and attorney Brunson's letters in the record and it's dated August 25th and it's on page 1415 and he's quoting from dr. Cook and dr. Cook says I wasn't aware of these drugs and I believe they would have exasperated his psychosis, but I still stick to my original opinion that he was and I he was not guilt. He wasn't McNaughton and saying at the time and he could was competent to stand trial. So dr. Cook said that these drugs may have exasperated the condition, but they did not affect his overall opinion as to the defendants mental state and when we initial argument here with how much time should be equal to be told where I read the record is from 2000 to 2009 to defendant was considered a relatively stable and that is condition maybe started deteriorating and 11 and 12. Mr. Mr. litigation and 13. So Mr. When his condition had deteriorated, that's when he actually started the litigation. Mr. Cassandra. Can you hear me? Yes. Can you hear me? Mr. What does the record show if anything and I know this is an old record and in fact, I believe we don't even have the colloquy of the plea available because of the age of the records are more to the point because the portions of the record were just destroyed by the by the county along the way as apparently in an ordinary culling process, unfortunately, but does anything in the record demonstrate just whether and I'm talking about not only at the time of trial, but but in the PCRA that what Defense Council was looking to do was to argue an involuntary intoxication defense here or that that could have been available because of the riddle and information. Yes, your honor. My argument is that when you look at the law of involuntary intoxication in Pennsylvania, it's an extremely limited defense. Well, I was I was getting to that but I didn't want to ask you. Hi, I asked you if there was anything in the record suggesting that that's the direction the defense was going in because I I'm not even I'm not even sure that there is an involuntary intoxication defense. Maybe there is but I I know that Mr. Wallace has argued that the Pennsylvania Superior Court cases favorably view that I'm not sure what they mean by that. We do know that the Supreme Court of Pennsylvania has not recognized such a defense. No, your honor. The I there was nothing in the record indicating that that was on anybody's radar at the time. And when you read all the intoxication involuntary intoxication defenses, most of them assume it will exist for this purpose, but they're usually in the context is well if it did exist who has the burden of proof or if it does exist, what's the correct jury? They never flat out. I said we have an intoxicated involuntary intoxication defense here in Pennsylvania. And in those cases where they've actually discussed it, it's usually it's with DUI and the standard jury instruction says only to be used in DUI cases. Right, so it's limited to that. Yes. Can I ask a question on on the direction of polling? Our court has not issued a presidential opinion providing the factors for courts to consider and evaluating a global tolling based on mental illness. What factors do you think we should adopt? Well, your honor. First of all, I think there has to be a finding that the mental condition was such that it would prevent the defendant from being convicted of or I keep referring to others defendant. I'm so used to practicing in state court. We understand that that the the mental condition prevented him from acting in such a way as to exercise his right. There has to be some type of link between a mental condition and not filing and and then there's got to be a due diligence component in that because what factors would you suggest that we consider if you have a not presidential opinion? Are you familiar with that case? What was that again? Your honor? I'm having trouble hearing you. We have a not presidential opinion. P-H-A-M-P-N-E-Y. Are those factors you think we should consider? I'm not, I don't, I'm not that familiar with that case, your honor. But I do think it's got to be based on the mental condition and how that in fact prevented the defendant from exercising his rights in a timely manner. Well, Chambney, Chambney is a not presidential opinion, but Mr. Cassanta, the petitioner has argued that case over about four pages of his brief. It's cited,  So it was relied upon to a considerable extent by Mr. Wallace. Your honor, the approach I took when I was looking at the equitable tolling, I looked at the allegations and he has put forth by and I said, okay, assuming all this is true, does it get him over the hump? And when I looked at it, basically their stability for at least nine years. And then when he started litigating by his own admission when he was deteriorating. Which nine years? From 2000 to 2009. Then he sent his allegations where he started deteriorating again in 11 and got worse in 12. So we have a large swath of time here that it's not that they haven't established that he was incapable of doing a filing a timely petition. Your honor. I mean, let's go. Let's go back to the I mean the factors if you look at pages 29 through 33. Of the opening brief. It's front and center to look at the champion. You're telling me that you're not familiar with those. So I mean we can go on but that does seem to be a very important part of the equitable tolling argument put out by the public federal public defender. I'm sorry, your honor. I don't have it right in front of me and I can't recall that it right at this time. All right, but I'm assuming if this court has already issued that that I'm sure that this it was it's not presidential. It's been a used by a lot of district courts because it's the the one thing that that's out there and it seems to be fairly uniform, but we have not adopted anything. But I was just trying to see if you had any thoughts is to help us hone our thinking with respect to the things that we should consider when we deal with equitable tolling in the case of mental illness. I'm sorry, your honor. I just don't think I am qualified to speak on all that but I don't disagree that you should be your print the you've been using so far as I was familiar with it at the time. I wrote my brief. Unfortunately, my memory is eluding me right now. All right. Unless your honors have any questions. I can rest on our brief. Judge McKee judge Embrough. No questions. All right. We'll have Mr. Saylor back on rebuttal. You're on. If I may start, I think I want to emphasize a few things. One is that I think there needs to be an evidentiary hearing which is what I asked for my brief regarding equitable tolling. There's no mention in for instance, the magistrate judge opinion about any reference to the condition that bipolar disorder plays on or the effect of the bipolar disorder has on someone's ability to file federally. There's no mention of the DSM-5. There's no mention of what the kind of impairments that a person like Mr. Wallace would experience. There is an interpretation of medical records essentially in isolation. Again, I think we are placing a lot of emphasis on the word remission 2007-2009, but we have affidavits that show that he was extremely slow and that even through the period after he filed his... Are you are you arguing for an evidentiary hearing for purposes of attempting to explain why there was not a more timely filing here or are you asking for an evidentiary hearing for purposes of demonstrating the mental condition of Mr. Wallace back at the time the plea was entered? Well, that's my question as well. I don't understand why you're focusing on equitable tolling hearing. I can certainly focus on actual innocence. In terms of the actual innocence, I would also be asking for an evidentiary hearing. I think we... Mr. Wallace... You don't just come in Mr. Saylor and say I want an evidentiary hearing. Give it to me. I mean, you have to have some purpose because the burden is going to be, the burden of production here is going to be on you. What is it that you want to show? And I'm afraid I'm no more clear on that right now than I was when I entered the courtroom. Regarding the actual innocence or the equitable tolling? Tell me both. The actual innocence, I would like to do exactly what Dr. Cook recommends in his 2013 letter, which is have a medical, person with a medical degree review the effect of Ritalin on Mr. Wallace's bipolar disorder. Where did Dr. Cook say that? In his 2013 letter. He wrote to the PCRA counsel. I'm sorry, it's not right in front of me, but I can certainly write the court with that information. But he wrote PCRA counsel and said that it could have exacerbated his condition and that we would need a medical doctor to confirm that. We would need a psychopharmacologist to confirm that, which is what Mr. Wallace... All right. So, but I go back to a question I've asked two or three times and that is what does the exacerbation of his condition as a result of having taken Ritalin do to help you here in terms of any defense that would be interposed? What difference does the causative agent, whether it's biochemical within Mr. Wallace himself and not some exogenous source versus a reaction from a medication taken by him back at the time, around the time of the killing. What does that do for you? The manifestations remain the same. And so presumably the opinion is going to remain the same because it's based on what Mr. Wallace told the doctors, what they observed when they talked with him, the medical records that they themselves looked at. What is it that 21 years after the crime you think can be produced here that's helpful? I don't think we can presume that the expert opinion would have been the same if Dr. Cook or Dr. Sayadat at the time had really examined that link between Ritalin and dyslipidosis. I think that's not- Don't you feel you have some burden to come in and tell the district court what it is you have based upon the universe of information and knowledge, pharmacological knowledge with respect to Ritalin that is available now, available to you even without an opinion yet, and why that should support the grant of an evidentiary hearing? Well, in my brief, for instance, I say that the manufacturers of Ritalin have recognized that it can fuel and trigger and heighten the kinds of conditions that Mr. Wall suffers from. It can trigger psychosis. That's why they added the label some years later. Well, but all these doctors opined that he was psychotic. No question. That's correct. Again, I don't think that we can, as lawyers and judges say, if I have an expert in a case and I don't give him all the information, that I don't see how I can be effective as a lawyer, nor can I see how that expert could be complete in rendering an opinion. That's all we're asking for. What information would- Because here it's not the lawyer giving the expert information. The expert has the information. The expert knows what Ritalin can impact on the bipolar disorder. What information, after arguing that the layperson should have given the expert information that the expert already would have known as part of his expertise? Well, Dr. Cook says that he was unaware of it. While Mr. Wallace may have told him that he believed it was a ramblings of someone. Well, Dr. Sadov states explicitly on page four of his June 9, 2000 report that a psychiatrist named Dory Middleman, who would prescribe for him, he states she prescribed Paxil and Ritalin. So, at least as of June 9, 2000, one of the experts early on in this case, Dr. Sadov, had knowledge explicitly that Mr. Wallace had had prescribed for him Ritalin. And this is after the period in the 90s when the FDA went so far as to require a Ritalin. Relabeling of Ritalin, didn't it? Yes, that's my information. Because of, at least, the effects that were determined it had on young children who had a pre-existing psychosis. So, Dr. Sadov, A, never noted that Dr. Middleman prescribed Ritalin PRN, which is as needed, which I think certainly got Mr. Wallace into trouble. So, he was essentially taking it whenever he wanted. I think that's a huge factor here in explaining why his psychosis, according to Dr. Bebo, spun out of control. And that he recommended a review. Judge McKee, do you have further questions, Judge McKee and Judge Ambrose? I do. On actual innocence, you argue that Mr. Wallace controlled actual innocence through involuntary intoxication. But are you aware of a single case where a Pennsylvania court has allowed that defense in a non-DUI situation? Your Honor, I'll acknowledge that the Pennsylvania courts have not dealt with this extensively. I think your question, no. But it does not mean that if I give someone, or if my client takes a bunch of pills that's being prescribed by him, and that causes him to act in a certain way, that that's not relevant for the case. And the Pennsylvania courts wouldn't recognize that as a defense. Again, involuntary intoxication would be more akin to a temporary insanity. Which actually leads to my second question on this point. Why wasn't the defense insanity? So at the time, the experts who were evaluating Mr. Wallace said that he understood the wrongfulness of his conduct. They explicitly said, this is not a McNaughton case, didn't they? That's correct, Your Honor. It would seem that there are two time periods you look at. At the time of the trial, and the confidence that he was fit for counsel at trial. And I guess what they were saying, based on those reports, is at the time of the committing of the crime, that they did not believe they could meet the elements of insanity. Is that correct? That's correct. There was an opinion by all experts that said that he was not with the Ritalin. And I would say that just to address an earlier point, that the trial judge, when faced with a motion to exclude evidence of insanity, denied that and said that he would allow any evidence regarding insanity. Which, very well, if the link between Ritalin and the psychosis was explored and investigated and presented to a jury at a trial. But it never was. I think that's the crux of the matter here. Is that it could have been presented. And it was not. That's new reliable evidence. That's something that the trial counsel did not do. So the bottom line of your argument has to be, then, that there would be expert opinion that would state that Ritalin can lead to such an exaggeration as to constitute insanity. Isn't that the logical extension of your argument? Your Honor, I think looking at the context of the other evidence in this case, we would say that Ritalin would, yes, that Ritalin would be insanity. Because of the other indications of religious-fueled psychosis, that, or sorry, religious-oriented psychosis, that it was a result of stimulant use. Any further questions, colleagues? Judge McKee, Judge Ambrose, any further questions? If not, we'll take the case under advisement. It is interesting. It is important. Thank you, Mr. Saylor. Thank you, Mr. Cassenta. This argument is completed. Thank you.